## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF ILLINOIS

GALAXY PRODUCTS & SERVICES, INC.,

        Plaintiff,

   v.

AMI ENTERTAINMENT NETWORK, INC.,

Serve:  Illinois Corporation Service, Registered
       Agent.
      801 Adlai Stevenson Dr
      Springfield, IL  62703-4261

        Defendant.

Case No.  3:12-cv-00595-MJR-DGW

### COMPLAINT

Plaintiff, Galaxy Products & Services, Inc. ("GPS"), for its Complaint against AMI Entertainment Network, Inc. ("AMI"), states as follows:

### PARTIES

1.    Plaintiff GPS is an Illinois corporation with its principal place of business in Davie, Florida.

2.    Defendant AMI is a Delaware corporation with its principal place of business in Bristol, Pennsylvania.

### JURISDICTION

3.    This Court has subject matter jurisdiction over this lawsuit pursuant to 28 U.S.C. § 1332.  Plaintiff and Defendant are citizens of different states and, as more fully set forth herein, the amount in controversy exceeds $75,000.00, exclusive of interest and costs.

4.    Venue is proper under 28 U.S.C. § 1391(b), because as set forth more fully herein, a substantial part of the events or omissions, and effects of the events or omissions, giving rise to the claim occurred in this District.

## ALLEGATIONS COMMON TO ALL COUNTS

### AMI Considers Entering the Illinois Regulated Gaming Market

5.      In 2009 and 2010, AMI sought to enter into the regulated gaming market in the State of Illinois.

6.      One of AMI's business activities is the construction of hardware to run video amusement games or Amusement With Prize ("AWP") games, creation of software to video amusement games or AWP games, as well as design of the shells which contain the hardware and software, referred to as "cabinets."

7.      For purposes of the regulated gaming industry in Illinois, a finished gaming cabinet, with functional video game gambling software and hardware contained within the cabinet, is known as a Video Gaming Terminal Machine Unit ("VGTM").

8.      The design of a VGTM involves the creation of software and hardware to run the games and development of the cabinet for containment of the hardware running the software.

9.      The software design is often the most expensive and time-consuming portion of VGTM design, because it forms the backbone of the gambling experience, including software design to assure that the game performs to the parameters of the gaming laws of the applicable jurisdiction, as well as to create customer likeability and performance enough to be economically competitive with other games in the relevant marketplace.

10.     A VGTM in the State of Illinois also requires an interface protocol for communication with the Illinois Gaming Board ("IGB").

11.     There are strict regulations and requirements for any corporation seeking to market and sell regulated gaming devices in the State of Illinois. *See* 230 ILCS 40/1 (2009) *et seq.*

- 2 -

12.     In 2010, AMI's parent company, Harbour Group, determined it would not be in the best interests of AMI to pursue the regulated gaming market in the State of Illinois.

### AMI Convinces GPS to Enter the Illinois Regulated Gaming Market

13.     Thomas Fricke ("Fricke") was counsel for AMI in 2010.

14.     Michael Maas ("Maas") was President and CEO of AMI in 2010.

15.     In 2010, AMI, acting through Fricke, approached Brenda Kinnaman ("Kinnaman") to locate clients to purchase hardware (such as cabinet components) and license AMI properties and pursue the regulated gaming market in the State of Illinois.

16.     Further, in 2010, both Maas and Fricke stated to Kinnaman that AMI had already spent a substantial amount of money in software design for the Illinois regulated gaming industry, periodically saying AMI had spent "over one million dollars" on design.

17.     Upon the urging of Fricke, Kinnaman approached John Bailey ("Bailey") regarding the opportunity to license the AMI properties and enter the Illinois regulated gaming market.

18.     During 2010, Bailey met in person and over the phone with representatives from AMI, during which times Maas reiterated that AMI had spent substantial amounts of money on game design and that with the help of their sister company in the United Kingdom, Games Warehouse (which had experience designing and producing VGTMs in the United Kingdom), AMI and GPS could bring unique products to the Illinois regulated gaming market.

### GPS Invests Heavily in AMI's Products for the Illinois Regulated Gaming Market

19.     In reliance upon Maas' and Fricke's statements, Bailey met with investors and incorporated GPS in August 2010, in order to pursue the proposed business opportunity with AMI in the regulated gaming market in the State of Illinois.

20.     In early October 2010, GPS and AMI signed a Letter of Intent regarding the parties' intent to sign a contract for the production of VGTMs for the Illinois Regulated Gaming market.

21.     On October 18, 2010, and October 19, 2010, GPS, through Bailey, met with representatives and agents from AMI, including Maas and the President of Games Warehouse Kevin McGovern ("McGovern"), to discuss the games that GPS would bring to the Illinois regulated gaming market.

22.     At this mid-October meeting, the parties agreed to thirteen games to be designed or modified for the Illinois regulated gaming market.

23.     Under the Illinois Video Gaming Act, the IGB was to publish the relevant interface protocol for VGTMs through a bidding process.

24.     Companies wishing to enter the Illinois regulated gaming market were required to design VGTMs to prepare for the market and ultimately integrate the interface protocol with the finished VGTM.

25.     Thus, AMI and GPS worked to design the games for the Illinois regulated gaming market during 2010 and 2011.

### AMI Assures GPS that Games are Complete

26.     As early as February 2011, Maas stated to Bailey that several of the games were complete and "on the shelf."

27.     AMI stated that these "on the shelf" games were "completed," "done," and "finished," such that they only required integration with the interface protocol and testing by the Independent Testing Laboratory for the IGB in order to be deployed in the Illinois gaming market.

28.     In reliance upon AMI's statements that game design was progressing and that as many as six games were complete, GPS invested substantial time, money, and efforts in the advertisement, promotion, and development of the new VGTMs which GPS could bring to the regulated gaming market in Illinois.

29.     In order to successfully enter this new market of regulated gaming in Illinois, it was essential to present new products as early as possible in 2012, therefore it was crucial to GPS that game design be ready for testing no later than January 31, 2012.

30.     Therefore, GPS's advertisement, promotion, and development of the VGTMs was directed towards scheduled demonstrations, regional trade shows and other sales and marketing activity as early as possible since purchasers intended to submit orders in early 2012.

31.     Having six games complete would have been sufficient to begin showing the VGTMs to potential customers and complete the process of obtaining an Illinois Gaming License.

### AMI Continues to Lure GPS With False Statements and Promises

32.     In June 2011, Maas specifically stated to Bailey that games were complete and were prepared for the Illinois market (pending integration of the interface protocol).

33.     During May and June 2011, Maas stated to Bailey that although the interface protocol had not been published, that the industry was aware which interface would be used, and that AMI would begin integrating this interface protocol with the games already designed and "on the shelf."

34.     GPS invested in the advertisement, promotion, and development of the VGTMs in reliance upon AMI's statements.

35.     After months of product development, a final contract dated November 9, 2011, was executed between GPS and AMI (the "November Contract").

36.     Although dated November 9, 2011, the November Contract was not signed until December 2011, at which time an Amendment to the November Contract was also executed ("December Amendment").

37.     The December Amendment required AMI to produce sample VGTMs by January 31, 2012, ready for testing by the Independent Testing Laboratory as well as for presentation in the Illinois regulated gaming market.

38.     This deadline was based upon the past assurances of AMI and Maas' explicit representation to Bailey on a phone conference on December 19, 2011, that Maas personally guaranteed that AMI would provide these sample VGTMs for six games by January 31, 2012.

39.     Further, during the December 19, 2011 phone conference Maas assured Bailey that although AMI was having some problem meeting the December 31, 2012 deadline, Maas acknowledged the necessity to deliver the VGTMs to the Independent Testing Laboratory so that the products could be available for early 2012 trade shows and sales and Maas assured GPS that the products would be delivered in a timely fashion to be presented to Independent Testing Laboratory.

40.     Maas' statement was reasonable to GPS, because it was in accord with other statements made by Maas, as well as the statements of other representatives and agents of AMI.

41.     GPS entered into the November Contract, as modified by the December Amendment, in reliance on AMI's statements regarding the progress of the relevant games.

42.     After the November Contract and December Amendment were signed, AMI continued to assure GPS that six of the games were or would be complete by January 31, 2012,

and ready to present to the Independent Testing Laboratory and the remaining games were nearly complete and samples for these remaining games would be produced by May 31, 2012.

43.     In reliance on AMI's statements, GPS continued to expend money and time in advertising and promoting the VGTMs for the Illinois market.

## AMI's Fraud Is Revealed

44.     AMI ultimately missed the January 31, 2012 deadline to produce VGTM samples for submittal to the Independent Testing Laboratory.

45.     During February and March of 2012, discussions between AMI and GPS revealed that the games were not complete, and the VGTMs could not be produced on a timetable which would permit GPS to present the VGTMs to purchasers at the start of this new market in regulated gaming in the State of Illinois.

## The Extent of GPS's Damages are Revealed

46.     Upon information and belief the market for new VGTMs in the State of Illinois is expected to be between 40,000 and 60,000 machines; these machines will be sold to purchasers for between $12,000.00 and $18,000.00.

47.     As of May 8, 2012, AMI has failed to produce finished VGTMs for inspection under the November Contract and December Amendment.

48.     In fact, GPS has even missed the key ICMOA Gaming Conference & Trade Show on April 4, 2012 and suffered severe damage to its reputation in the gaming market, due to its failure to produce the VGTMs, which AMI repeatedly promised were already complete.

49.     The time for entry into the opening of the new regulated gaming market in the State of Illinois has passed and GPS has been severely damaged in the form of lost profits, money expended to advertise, promote, and develop AMI's VGTMs, and damage to GPS's

reputation in the gaming industry will hinder GPS's ability to enter the gaming market in Illinois at any time in the future.

**COUNT I**
**FRAUDULENT MISREPRESENTATION**

50.     Plaintiff incorporates and adopts by references each and every allegation set forth in Paragraphs 1 through 49 above as if fully set forth herein.

51.     AMI, by and through its agents, as more fully set forth above falsely stated to representatives of GPS that video game design was complete on many of the games GPS ordered and that additional games were very close to completion.

52.     The agents for AMI, including its President and CEO, Maas, knew that AMI did not have the games completed or nearly completed.

53.     AMI made these false statements to GPS with the intent of inducing GPS to rely on AMI to provide VGTMs for the Illinois regulated gaming market, including inducing GPS to sign the November Contract and December Amendment.

54.     GPS reasonably relied on AMI's statements, because AMI was in the position to know the number of games it had completed; AMI was an established business in the electronic entertainment market; and AMI had originally pursued this market for its own interest.

55.     As a result of GPS's reliance on AMI's false statements  GPS entered into the Letter of Intent, the November Contract, and the December Amendment with AMI, accordingly GPS was substantially damaged in the following ways:

(a)     GPS   expended large sums of money promoting, advertising, and developing AMI's VGTMs, including the formation of GPS to pursue this market, totaling approximately $1 million, which will be proved specifically at trial;

(b)     GPS  missed the opening of this new regulated gaming market for which GPS's market share may have exceeded 20%, netting profits of over $20 million, which will be proved specifically at trial; and

(c)     GPS's name and reputation in the gaming industry was severely damaged by AMI's failure to deliver the VGTMs for inspection in a timely manner, which will hinder GPS's ability to enter the Illinois gaming market or any other gaming market in the future, which has damaged GPS in amounts over $5 million, which will be proved specifically at trial.

56.     Because GPS was fraudulently induced to sign the November Contract and the December Amendment with AMI, the contract and amendment are a nullity.

57.     AMI's behavior was willful and outrageous, demonstrating an evil motive or reckless indifference to the rights of GPS, such that punitive damages should be awarded to GPS in this matter.

58.     AMI's behavior in continuing the fraud against GPS is particularly malicious, in that AMI maintained the fraud well into 2012, despite the fact that AMI was nowhere near completion of the games in time to bring them to the Illinois regulated gaming market.

WHEREFORE, Plaintiff Galaxy Products & Services, Inc., prays that this Court enter judgment in its favor awarding GPS its actual damages fairly and reasonably believed to exceed the sum of Seventy-Five Thousand Dollars ($75,000.00), exclusive of interest and costs, together with pre and post-judgment interest, punitive damages, costs incurred herein, declaring the November Contract and the December Amendment a nullity, and for such other and further relief which the Court deems necessary and just under the circumstances.

## COUNT II
## NEGLIGENT MISREPRESENTATION

59.     Plaintiff incorporates and adopts by references each and every allegation set forth in Paragraphs 1 through 58 above as if fully set forth herein.

60.     AMI, by and through its agents, as more fully set forth above falsely stated to representatives of GPS that video game design was complete on many of the games GPS ordered and that additional games were very close to completion.

61.     In the alternative to Count I, the agents for AMI, including its President and CEO, Maas, stated that the games were complete or nearly complete, without knowledge whether the games were complete, or nearly complete.

62.     In the alternative to Count I, AMI's games were not completed or nearly completed when agents for AMI recklessly or negligently stated to GPS that the games were complete or nearly complete.

63.     AMI was under a duty to ascertain whether the games were complete or nearly complete before stating to GPS that the games were complete or nearly complete, due to the fact that only AMI would know if the games were complete or nearly complete and the fact that the short time frame for regulatory approval required that AMI be able to produce the VGTMs for inspection quickly.

64.     AMI made these false statements to GPS to induce GPS to rely on AMI to produce VGTMs for the Illinois regulated gaming market, including inducing GPS to sign the November Contract and December Amendment.

65.    GPS reasonably relied on AMI's statements, because AMI was in the position to know the number of games it had completed; AMI was a established business in the electronic entertainment market; and AMI had originally pursued this market for its own interest.

66.    As a result of GPS's reliance on AMI's false statements  GPS entered into the Letter of Intent , the November Contract, and the December Amendment with AMI, accordingly GPS was substantially damaged in the following ways:

(a)    GPS expended large sums of money promoting, advertising, and developing AMI's VGTMs, including the formation of GPS to pursue this market, totaling approximately $1 million, which will be proved specifically at trial;

(b)    GPS missed the opening of this new regulated gaming market for which GPS's market share may have exceeded 20%, netting profits of $20 million, which will be proved specifically at trial; and

(c)    GPS's name and reputation in the gaming industry was severely damaged by AMI's failure to deliver the VGTMs for inspection in a timely manner, which will hinder GPS's ability to enter the Illinois gaming market or any other gaming market, in the future, which has damaged GPS in amounts over $5 million, which will be proved specifically at trial.

67.    Because GPS was fraudulently induced to sign the November Contract and the December Amendment with AMI, the contract and amendment are a nullity.

68.    AMI's behavior was outrageous, demonstrating reckless indifference to the rights of GPS, such that punitive damages should be awarded to GPS in this matter.

69.    AMI's behavior in continuing to negligently misrepresent the status of the game design to GPS is particularly malicious, in that AMI maintained the misrepresentation well into

2012, despite the fact that AMI was nowhere near completion of the games in time to bring them to the Illinois regulated gaming market

WHEREFORE, Plaintiff Galaxy Products & Services, Inc., prays that this Court enter judgment in its favor awarding GPS its actual damages fairly and reasonably believed to exceed the sum of Seventy-Five Thousand Dollars ($75,000.00), exclusive of interest and costs, together with pre and post-judgment interest, punitive damages, costs incurred herein, declaring the November Contract and the December Amendment a nullity, and for such other and further relief which the Court deems necessary and just under the circumstances.

## COUNT III
## DECLARATORY JUDGMENT

70.     Plaintiff incorporates and adopts by references each and every allegation set forth in Paragraphs 1 through 69 above as if fully set forth herein.

71.     There is an actual controversy between GPS and AMI regarding the production of VGTMs pursuant to the November Contract and the December Amendment.

72.     As set forth more completely above, GPS was fraudulently induced to sign the November Contract and the December Amendment, based upon AMI's statements regarding the state of progress of the design and production of the VGTMs for the Illinois market.

73.     As a result of AMI's fraud, this Court has the authority to declare the November Contract and the December Amendment a nullity.

74.     It would be unjust to force GPS to adhere to a contract, and amendment thereto, which AMI fraudulently created and it would be a windfall to AMI to permit AMI to enforce the November Contract and December Amendment.

WHEREFORE, Plaintiff Galaxy Products & Services, Inc., prays that this Court enter judgment in its favor declaring the November Contract and the December Amendment a nullity,

and for such other and further relief which the Court deems necessary and just under the circumstances.

                              **LATHROP & GAGE LLP**


                              By:___/s/ Matthew A. Jacober_____.
                              Matthew A. Jacober (#06256140IL)
                              Pierre Laclede Center
                              7701 Forsyth Boulevard, Suite 500
                              Clayton, Missouri 63105-1875
                              Telephone: (314) 613-2800
                              Telecopier: (314) 613-2801
                              E-mail: mjacober@lathropgage.com

                              And

                              Mark H. Levison
                              Clayton E. Gillette
                              LATHROP & GAGE LLP
                              7701 Forsyth Boulevard, Suite 500
                              Clayton, Missouri 63105-1875
                              Telephone: (314) 613-2800
                              Telecopier: (314) 613-2801
                              E-mail: mlevison@lathropgage.com
                              E-mail: cgillette@lathropgage.com

                              Attorneys for Plaintiff


Dated: May 8, 2012